UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MR. HAYAT SIKANDER, and
MRS. CATHERINE SIKANDER,

        Plaintiffs,

v.                                                                          Case No. 16-cv-550-pp

LORETTA E. LYNCH, JEH JOHNSON,
THOMAS CIOPPA, and KAY LEOPOLD,

        Defendants.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 12) AND DISMISSING CASE**

---

The plaintiffs filed this case under the Administrative Procedures Act ("APA"), 5 U.S.C. §701, *et seq.*, challenging the United States Citizenship and Immigration Services' ("USCIS") denial of the I-130 petition Catherine Sikander filed on her husband's behalf. An I-130 petition establishes a United States citizen's relationship to a relative wishing to immigrate to the United States. The defendants moved for summary judgment, arguing that there was no genuine issue of material fact, and that the denial of the I-130 petition was reasonable and not arbitrary or capricious, or otherwise contrary to law. The defendants also argued that the plaintiffs provided no evidence to support their Fifth Amendment Due Process claim. At a hearing on October 18, 2017, the court granted the defendants' summary judgment motion. This order provides the court's reasoning in more detail.

1

## I. Standard of review

The APA governs judicial review of an agency's final decision, Boutté v. Duncan, 348 Fed. Appx. 151, 154 (7th Cir. 2009), and the standards the court applies on summary judgment in APA cases differ from those the court applies in a typical civil case. J.N. Moser Trucking, Inc. v. U.S. Dept. of Labor, 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004). The evidence to which the court looks in deciding a summary judgment motion in an APA case is the administrative record presented by the agency. See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744–745 (1985).

A court may set aside an administrative agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); Israel v. USDA, 282 F.3d 521, 526 (7th Cir. 2002). To determine whether the agency's decision was arbitrary or capricious, the court considers whether it was "'based on a consideration of the relevant factors and whether there has been clear error of judgment.'" Ind. Forest Alliance, Inc. v. United States Forest Serv., 325 F.3d 851, 858–59 (7th Cir. 2003) (quoting Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989)). Under this narrow, highly deferential standard, the court upholds an administrative decision so long as "the agency's path may be reasonably discerned." Mt. Sinai Hosp. Med. Ctr. v. Shalala, 196 F.3d 703, 708 (7th Cir.1999) (internal quotation marks and citation omitted). A court will not vacate an agency's decision unless the agency has

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of

> the problem, offered an explanation for it decision that runs counter to the explanation before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (citation omitted). It is not enough that [the court] might have reached a different conclusion; so long as a reasonable mind could find adequate support for the [agency's] decision, it must stand." Ogbolumani v. Napolitano, 557 F.3d 729, 733 (7th Cir. 2009) (citation omitted).

On the other hand, a reviewing court may not defend a decision on a new ground not set forth in the original decision. Lara v. Lynch, 789 F.3d 800, 806 (7th Cir. 2015).

## II. Analysis

### A. The Plaintiffs' Failure to Comply with the Rules

Rule 56(c)(1) of the Federal Rules of Civil Procedure requires a party asserting that a fact is genuinely disputed to support that assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers or other materials

or "showing the materials cited do not establish the absence . . . of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Civil Local Rule 56(b)(2)(B)(i) requires that the party opposing the motion file a concise response to the moving party's statement of facts, with "specific references to the affidavits, declarations, parts

3

of the record and other supporting materials relied upon." Civ. L.R. 56(b)(2)(B)(i)(E.D. Wis.).

The plaintiffs have not complied with these rules. The plaintiffs did not file their own proposed findings of fact. Instead, they filed a document entitled "Plaintiffs' Responses to Defendants' Proposed Findings of Facts in Support of Summary Judgment." Dkt. No. 18. This document reproduces each of the defendant's proposed findings of fact in paragraph form, then follows each paragraph with language such as, "Response: Agree," or "Response: Deny and object as to relevance," or "Deny." These bare assertions do not comply with the requirements of the rules—they do not provide the court with citations to the administrative record to refute the facts they purport to deny.

The plaintiffs also filed a brief in opposition to the motion for summary judgment, in which they asserted certain facts. Dkt. No. 16. The plaintiffs did not attach any excerpts of the administrative record to the brief, and in many places, they asserted facts without referencing any support for those facts in the administrative record. For example, on page 7 of the brief, in footnote 2, the plaintiffs state, "Catherine was not living in Arizona for more than one year as the government suggests." Dkt. No. 16 at 7, n.2. There is no cite to the record in support of this claim. In other places, the plaintiffs cite to the record, but the record does not support the fact they assert. For example, on page 8 of their brief, the plaintiffs state that notes from two USCIS interviews reflected that Catherine Sikander had told the interviewer that Hyat Sikander had attended two different mosques and that he attended church with her one time. The

4

brief cites to the administrative record at pages 224-226. But the notes state, "—Muslim, Kenosha, 60th St. Hw C, Milwaukee, Every Friday, --Christian, went one time in Kenosha *does not know when/where, Assembly of God. Over a year since last time." Dkt. No. 11-3 at 65-67. In other places, the plaintiffs stated facts "upon information and belief." Dkt. No. 16 at 9, n.3.

The plaintiffs failed to support their own arguments with additional proposed findings, or with specific citations to the record, as required by Fed. R. Civ. P. 56 and Civil L.R. 56(b)(2)(B)(ii). Accordingly, in deciding whether to grant or deny the motion for summary judgment, the court looked only to the administrative record and the proposed findings from the defendant that were supported by the record.

B. <u>The Court's Findings of Fact</u>

1. *2002 I-130 Petition and Denial*

Hayat Sikander ("Hayat"), a citizen of Pakistan, married Catherine Holewinski ("Catherine"), a United States citizen, on August 4, 2001. Dkt. No. 11-3 at 41. Seven months later, on March 19, 2002, Catherine filed an I-130 Petition for Alien Relative ("I-130" petition) on Hayat's behalf, seeking to classify him as the spouse of a United States citizen. Dkt. No. 11-1 at 37; Dkt. No. 11-3 at 41.

The USCIS interviewed Hayat and Catherine. Dkt. No. 11-3 at 30, 46, 72-73. During that interview, Hayat and Catherine were under oath. The agency representative asked them basic questions about their relationship, and at times, they provided inconsistent answers. For instance, when asked whether

5

or not they had a dishwasher, Hayat answered "yes," while Catherine answered "no." When asked what they had for dinner last night, Hayat answered "nothing, we didn't eat together," while Catherine answered, "McDonald's." When asked the color of the sheets on their bed, Hayat answered "pink," while Catherine answered "white." When asked what Hyat gave Catherine for her last birthday, Hayat initially answered "a ring," then answered, "two rings, one ruby and one white gold;" Catherine answered "fifty dollars," but was unsure. Dkt. No. 11-1 at 37; Dkt. No. 11-3 at 30, 46-47; 72-73.

During the interview, the USCIS learned that Hayat and Catherine had lived apart. Catherine had been living in Arizona, separately from Hayat, since June 2004. Dkt. No. 11-1 at 37; Dkt. No. 11-3 at 30, 47. She previously had filed two other marriage-based immigration applications, and one of those applications was approved. Catherine was married to the first husband from 1977 to 1980, and the second husband from 1987 to 1991. Dkt. No. 11-2 at 23; Dkt. No. 11-3 at 28, 30, 33, 40.

The USCIS denied the I-130 on November 30, 2005, on the ground that the applicant failed to establish a *bona fide* marital union and eligibility for benefit sought. Dkt. No. 11-3 at 29-30. The denial specifically cited the discrepancies in answers in the interview, the fact that the couple had been living in different states, and the fact that Catherine Sikander had filed applications on behalf of two previous spouses. Id. at 30.

### 2. *2005 I-130 Petition and Denial*

On December 26, 2005, Catherine filed a second I-130 Petition for Alien Relative on behalf of Hayat. Dkt. No. 11-1 at 38. In relation to this application, the USCIS interviewed Hayat and Catherine on June 21 and August 3, 2006. During the interviews, Catherine and Hayat were unable to answer basic questions about each other, such as the side of the bed each slept on, their home address, when and where each attended church, and whether Catherine returned to Wisconsin to visit Hayat when she lived in Arizona. Dkt. No. 11-1 at 38; Dkt. No. 11-3 at 23, 62-68. On July 31, 2007, the USCIS denied the petition on the basis that the applicant failed to establish that she ever had a marital relationship and that the marriage was not one that was entered into for fraudulently obtaining immigration benefits. Dkt. No. 11-3 at 22-23, 26-27. This denial cited the same discrepancies mentioned in the November 30, 2005 denial.

### 3. *2008 I-130 Petition and Denial*

On May 21, 2008, Catherine filed a third Petition for Alien Relative on behalf of Hayat. In support of this petition, counsel for Catherine and Hayat submitted the following documents: Integrity Mutual Insurance Cancellation Notice; Vehicle title for a 1999 Ford issued in both names; lease agreement for an apartment located at 11130 W. Morgan Avenue, Apt. #206 (signed by Hayat only); lease agreement for an apartment located at 5009 58th Street signed by both Hayat and Catherine; copies of several family photographs and cards; Jantz Auto Sales and Service receipt documents in both names; American

Family Insurance Group payment receipt; and a Sprint billing statement in both names. Dkt. No. 11-2 at 17, 35-80; Dkt. No. 11-3 at 1-14.

On September 16, 2010, an immigration officer conducted a site visit to Hayat and Catherine's last known address of 11130 W. Morgan Avenue, Apt. #206, Greenfield, WI. Present during the site visit were Catherine and her son Chris. Dkt. No. 11-1 at 38; Dkt. No. 11-2 at 17; Dkt. No. 11-3 at 43, 55. The immigration officer noted that the apartment had only two bedrooms; Catherine stated that she slept in one bedroom and that Chris slept in the other bedroom. Dkt. No. 11-1 at 38; Dkt. No. 11-2 at 17, 43.

Catherine told the immigration officer that Hayat slept at his children's apartment, but was unable to provide the address, saying that she had forgotten it. Chris later stated that the apartment address was 8214 Howard Avenue, Milwaukee, and Catherine confirmed that as the correct address. Dkt. No. 11-1 at 38; Dkt. No. 11-2 at 17; Dkt. No. 11-3 at 43, 55. Catherine stated that Hayat did not spend much time at the Morgan Avenue apartment, and that he did not reside with Catherine during the week. Id. She also stated that Hayat kept some of his clothing at the Morgan Avenue apartment; the immigration officer observed two pieces of male clothing in the closet. Dkt. No. 11-1 at 39; Dkt. No. 11-2 at 17; Dkt. No. 11-3 at 43, 55. According to Catherine, she had last eaten with Hayat on September 9, 2010 (when he brought her food from McDonald's), and had last seen Hayat on September 13, 2010. Id. She also said that she did not receive anything in return for marrying Hayat, but that Hayat paid bills such as rent, electric and groceries, and that

he brought her and Chris food. Dkt. No. 11-1 at 39; Dkt. No. 11-2 at 17; Dkt. No. 11-3 at 43-44.

The immigration officer interviewed the leasing consultant for the Morgan Grove Apartments. The leasing consultant stated that Hayat's name was on the lease for the Morgan Avenue apartment, but that Hayat did not reside in the apartment with Catherine. Dkt. No. 11-1 at 39; Dkt. No. 11-2 at 18; Dkt. No. 11-3 at 44, 55. In addition, the immigration officer visited the address provided by Catherine and Chris as being Hayat's children's apartment. The officer confirmed that neither Hayat nor his children lived at 8214 Howard Avenue, Milwaukee. Dkt. No. 11-1 at 39; Dkt. No. 11-2 at 18; Dkt. No. 11-3 at 56. The immigration officer concluded that Hayat did not reside with Catherine and her son Chris. Dkt. No. 11-3 at 44.

On December 15, 2011, the USCIS issued a Notice of Intent to Deny the Petition for Alien Relative, and gave Catherine thirty days to submit evidence to overcome the derogatory evidence. Dkt. No. 11-1 at 13, 15. Approximately one month later, the USCIS received a response from Catherine's counsel. The response contained the following: affidavits from Catherine and her son Cruz Rodriguez; statements from Catherine's mother, sister, niece, aunt, sons and Hayat's children which previously were provided to Catherine; various photographs of the Sikanders with family and in other settings; various photographs of the Christmas season which included Catherine and her family with Hayat and his family; an undated letter from the Sikanders' landlord; a letter from one of Catherine's oncologists stating that Hayat was present with

9

her at an appointment (which also served as an excused absence for Hayat to his employer); three holiday cards from Catherine's aunt, sister and mother to Catherine, Hayat and the kids; a photograph of numerous pieces of what appeared to be men's clothing in a closet at 11130 W. Morgan Avenue; and copies of Catherine's medical prescriptions. Dkt. No. 11-1 at 40, 43, 45-60; Dkt. No. 11-2 at 1-15.

After reviewing these documents, the USCIS noted that in contrast to Catherine's affidavit, Catherine had told an immigration officer in a prior interview that Hayat did not spend much time at her apartment, did not live with her during the week and slept at his children's apartment. Dkt. No. 11-1 at 40. The USCIS noted that the Cruz Rodriguez affidavit averred that the marriage was valid and that Hayat saw Catherine on a daily basis, but that that information was in direct contrast to the information Catherine had reported to the immigration officer. Id.

The USCIS followed up on the documents, contacting Jerry Cook, the Sikanders' landlord, who provided a letter. Cook indicated that the letter was based solely on the leasing information provided, and stated that he could not verify whether or not Hayat resided at the apartment with Catherine. Cook could not provide an explanation as to why the leasing agent who worked at the apartment building would state that Hayat did not live in the apartment. Dkt. No. 11-1 at 41. The USCIS also recalled that a rental manager's notes from January 24, 2005 stated that Hayat had told the manager that Catherine

10

"will not be living there, but needs to have her name on the lease in order to be able to have his kids from Pakistan come here." Id.

With regard to the other documents Catherine had submitted, the USCIS found that Catherine's mother's letter did not discuss Catherine's living arrangements; that the medical excuse indicated that Hayat had attended one of Catherine's medical appointments *after* the USCIS interview; that the submitted emails bore no signatures, failed to indicate who attached the photos, and were from 2009; and that the handwriting on the cards from "mom" and from "Tom and Theresa" was similar. Id.

As to the photos Catherine submitted, the USCIS found that the photos of family interactions appeared to have been taken at a select few events, because the clothing in the photos rarely changed. It also found that, as to the photo of men's clothing in a closet, it was impossible to tell if the clothes photographed belonged to Hayat or to Catherine's son. Id.

In a notice of decision to deny the petition dated February 10, 2012, the agency determined that Catherine had failed to meet her burden of proof that the marriage was entered in good faith and not solely for immigration purposes and denied the alien relative petition. Dkt. No. 11-1 at 3, 37; Dkt. No. 11-2 at 16-17. Catherine appealed to the Board of Immigration Review ("BIA"), and on September 11, 2013, the BIA affirmed, without opinion, the denial of the alien relative petition. Dkt. No. 11-1 at 22. On May 5, 2016, the Sikanders filed the present complaint, seeking review of the final administrative decision. Dkt. No. 1.

C. The Court's Conclusions of Law

A United States citizen may file a Form I-130 on behalf of an alien relative, asking the USCIS to formally recognize a marital relationship. 8 C.F.R. §204.1(a)(1). The Attorney General must decide, after an investigation of the facts, whether to approve the petition. 8 U.S.C. §1154(b). The USCIS, a division of the Department of Homeland Security, completes the investigation. 8 C.F.R. §100.1. The USCIS investigation includes identifying fraudulent marriages entered into for the purpose of evading immigration laws. 8 U.S.C. §1154(c).

The petitioner bears the burden of proving "by a preponderance of the evidence, that [the couple] intended to establish a life together at the time of their marriage." Brown v. Napolitano, 391 Fed. Appx. 346, 350 (5th Cir. 2010). Though the couple's intent at the outset of the marriage is the relevant question, "[w]hen assessing the couple's intent, courts look to both the period before and after the marriage." Surganova v. Holder, 612 F.3d 901, 904 (7th Cir. 2010). Looking at all relevant evidence, the USCIS must find "substantial and probative evidence, that the marriage was a sham from its inception." Brown, 391 Fed. Appx. at 351. If the USCIS determines a marriage is not *bona fide*, it must deny the I–130 petition and all future I–130 petitions on behalf of the beneficiary. 8 U.S.C. § 1154(c).

The plaintiffs argue that the USCIS acted arbitrarily, capriciously and contrary to law by failing to consider all relevant factors when concluding that Catherine and Hayat Sikander only entered into marriage to evade the immigration laws. According to the plaintiffs, the USCIS inappropriately fixated

on the nature of their relationship years after its inception, and arbitrarily disregarded evidence which indicated that the marriage was valid. The court has reviewed the record, and it disagrees.

Catherine filed her first petition seven months after her marriage to Hayat. When interviewed about that petition, the plaintiffs' interview responses were inconsistent on questions such as whether they owned a dishwasher, what they ate for dinner, the color of their sheets, Catherine's birthday gift from Hayat, and the fact that they did not reside together. While some of these discrepancies, such as a husband failing to recall what he gave his wife as a birthday gift, may seem minor standing alone, the law required the USCIS consider the record as a whole when determining whether the plaintiffs intended to establish a life together as husband and wife at the time of the marriage. And there was more to the record than the inconsistencies in interview answers. The USCIS also had before it at the time it denied the first petition the fact that Catherine and Hayat had lived in different states for significant periods of time between the date of the marriage and the denial of the petition. Finally, the USCIS was aware that Hayat was not the first husband for whom Catherine had filed an I-130 application; he was the third.

Using the deferential standard of review for APA cases, the court cannot conclude that the USCIS's reliance on these facts was arbitrary or capricious. These facts, combined, constituted substantial and probative evidence that the marriage was a sham from its inception.

Later, in support of subsequent petitions, Catherine explained her reasons for going to, and living in, Arizona. She explained that she had lost her job and had gone there to look for work, and that she hoped that Arizona could provide a good living environment for her and for Hayat. She asserted that Hayat had visited her in Arizona. With regard to her former husbands, Catherine asserted—in her affidavit, and through statements of others—that her first two husbands were abusive. All of these facts may be true. They do not, however, render the USCIS's decision arbitrary or capricious.

As time passed, the USCIS had more information to consider. The interviews that followed Catherine's second petition similarly revealed discrepancies in the couple's testimony regarding the side of the bed they each slept on, their home address, their church, and whether or not Catherine returned home to Wisconsin while living in Arizona. The September 2010 site visit revealed that Hayat did not spend much time in the apartment he claimed to lease, that Catherine could not provide an address of that apartment, that the closet contained only two articles of men's clothing, that Catherine last had eaten dinner with Hayat the week before, and that although they did not live in the same place, Hayat paid some of Catherine's expenses. The leasing consultant for the apartment where Catherine and her son lived indicated that Hayat did not reside there.

The law allows the USCIS to consider this post-marriage evidence in determining the couple's intent as of the time of the marriage. It was not

14

arbitrary or capricious for the agency to have considered this information as evidence that the couple married to evade the immigration laws.

After the USCIS issued its December 15, 2011 Notice of Intent to Deny the second petition, Catherine had the opportunity to rebut the finding of fraud and establish that the marriage was not entered into for the purpose of evading immigration laws. The USCIS received thirteen exhibits, including affidavits from Catherine and her son, letters and copies of e-mails, three greeting cards and photos. Noting continued discrepancies, the USCIS discussed this evidence in its February 10, 2012 Notice of Decision to Deny. Dkt. 11-1 at 3.

Catherine filed an affidavit stating that Hayat lived with her at 11130 W. Morgan Avenue in Greenfield, that he did not sleep overnight at her apartment "all of the time" because of his four children, and that she saw him daily. Her son Cruz also stated that Catherine saw Hayat daily. The USCIS could not reconcile this affidavit with Catherine's previous statements that Hayat did not spend much time in the apartment and did not live with her during the week, or with the evidence that Hayat did not live at Catherine's address or the other address that she had provided. The USCIS contacted Jerry Cook, the Senior Vice President of Metropolitan Associates, who wrote a letter at Hayat's request verifying Hayat's residency at 11130 W. Morgan Avenue, #206, from August 1, 2005 to January 6, 2012. Cook admitted to the USCIS that he based the letter solely on the leasing information provided, and that he could not verify whether Hayat resided in the apartment; however, Cook's leasing agent stated that Hayat did not live at Catherine's address. The rental manager's notes from

15

January 24, 2005 stated that Catherine would not be living at 5009 58th Street #17 (a previous address), but needed "to have her name on the lease in order to be able to have his kids from Pakistan come here."

Catherine also filed e-mails, cards and photos, but the USCIS pointed out that the e-mails had no signatures and were sent two years prior to the request. Even to this court (conceding that it cannot make its own factual findings), the handwriting on the greeting cards appeared similar even though the cards purported to be from different people, and the photographs appeared to have been taken at only a few events, given the backgrounds and clothing. The photograph of the closet full of men's clothes bore no date or other information that would have allowed the USCIS to identify whether the clothes belonged to Hayat or one of Catherine's sons.

The law allows the USCIS to consider this post-marriage evidence. The record as a whole demonstrates that the USCIS had substantial and probative evidence that the couple did not intend to make a life together at the time of the marriage.

In opposition to the summary judgment motion, the plaintiffs argue that the USCIS chose to rely on damning evidence, rather than looking at supporting evidence, such as the affidavit of Catherine's son Cruz Rodriguez. Cruz averred that the marriage was valid, that Catherine and Hayat talked and disagreed and celebrated like other married couples, and stated that Hayat cared for Catherine's other son, Carlos, while Catherine lived in Arizona. Dkt. No. 11-1 at 48. The plaintiffs also noted that while the agency relied on their

16

inability to answer questions about where they attended religious services and whether Catherine had returned to Wisconsin while she was in Arizona, the interviewing agent's notes showed the contrary. Finally, the plaintiffs cited to the fact that Catherine filed I-130 petitions for Hayat's four children living in Pakistan, and that these petitions were approved. Dkt. No. 11-2 at 29-33.

On APA review, this court cannot find that the USCIS should have given more weight to one piece of evidence over another. If the court were to do so, it would be substituting its judgment for that of the agency—an action the law specifically forbids. Nor do some of the examples the plaintiffs cite support their argument that the record contradicts the agency's conclusions. For example, the plaintiffs argue that the interview notes show that the plaintiffs answered questions about their attendance at religious services, and about Catherine's travel between Arizona and Wisconsin. But the notes in the record are sparse and vague. With regard to these issues, handwritten interview notes in the record stated, "Muslim, Kenosha --> 60th St., Milwaukee, Every Friday," "Christian, went one time in Kenosha, does not know when where, Assembly of God, Over a year since last time." Dkt. No. 11-3 at 65-67. Based on these cryptic notes, the court cannot find that the agency's conclusion that the plaintiffs gave contradictory information about attendance at religious services was arbitrary or capricious.

The plaintiffs provided no authority for their assertion that granting the children's petitions invalidated the USCIS' decision regarding the plaintiffs' marital status. The USCIS addressed the children's status, noting that they

17

were granted permanent residence as the step-children of Catherine, but that they did not reside with Catherine.

The plaintiffs have failed to demonstrate that the USCIS was arbitrary or capricious in concluding that they had not met their burden to show that they intended to establish a life together at the time of their marriage. Their own evidence showed little more than snapshots of time spent together years after their marriage. While Hayat may have accompanied Catherine to the doctor, paid some bills, or developed a relationship with her parents over time, the USCIS provided an adequate explanation—more than once—for its decision relating to their intent at the inception of the marriage. The court has no basis for finding that the USCIS acted arbitrarily, capriciously or contrary to law when finding the plaintiffs entered into marriage for the purpose of evading immigration laws.

Nor have the plaintiffs supported their claim that the "arbitrary and capricious review of the record and the clearly erroneous decision" deprived the plaintiffs of a meaningful review in violation of their Fifth Amendment due process rights. Dkt. No. 16 at 11. As the Seventh Circuit has explained, "arbitrary rulings do not necessarily infringe upon the right to due process." Obgolumani v. Napolitano, 557 F.3d 729, 735 (7th Cir. 2009). "Only 'egregious administrative irregularities may amount to constitutional violations.'" Id. (quoting Sokolv v. Gonzalez, 442 F.3d 566, 569 (7th Cir. 2006)). The two-sentence argument in the plaintiffs' opposition brief failed to identify any USCIS procedures that fell short of the constitutional protections. The

undisputed evidence in the administrative record revealed that the USCIS reviewed the petitions, conducted interviews, allowed Catherine to rebut adverse evidence and provided notice of its decisions. That constitutes due process.

### III. Conclusion

The court **GRANTS** defendant's motion for summary judgment, dkt. no. 12, and **DISMISSES** this case. The clerk of court will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 25th day of October, 2017.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**